# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

TRE DEVON JOHNSON,

Defendant-Appellant.

UNPUBLISHED
September 17, 2015

No. 321575
Oakland Circuit Court
LC No. 2013-247979-FC

Before: TALBOT, P.J., and WILDER and FORT HOOD, JJ.

PER CURIAM.

A jury convicted defendant of first-degree murder, supported by the alternative theories of premeditated murder and felony murder, MCL 750.316(1)(a) and (1)(b), possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, and unlawfully driving away an automobile (UDAA), MCL 750.413. The trial court sentenced defendant to life imprisonment for the murder conviction, to be served consecutive to concurrent prison terms of two years for the felony-firearm conviction and 213 days for the UDAA conviction. Defendant appeals as of right. We affirm.

I

Defendant was convicted of fatally shooting 24-year-old Leonard Graham on September 15, 2013, in Southfield, Michigan. On September 14, Graham drove his white Chevrolet Impala to defendant's apartment, where he, defendant, and two female friends celebrated Graham's birthday by watching a boxing match. In the early morning hours of September 15, Graham's two female friends left, leaving defendant and a sleeping Graham in the apartment. Graham's whereabouts were thereafter unknown for several days until his body was found in a wooded area near defendant's apartment. Graham died from a single gunshot to the back of his head.

Before Graham's body was found, defendant told Graham's father that he had not seen Graham since Graham was picked up by one of Graham's relatives. In the meantime, defendant had been driving Graham's Impala, and had told his girlfriend and the mother of his child, Paris Wilson, that the vehicle belonged to him. When Graham's father went to defendant's apartment and confronted defendant, he observed baby items in the car and it appeared as though defendant and Wilson were "moving into the car." Defendant had also covered or replaced a sticker on Graham's Impala, gave Wilson a spare key to the car, and talked about having the color of the car changed. Wilson was not concerned that the car belonged to Graham because, at some time

-1-

before September 14, defendant said that the person for whom he was house-sitting was going to give him a white Impala so he could get to work. However, Wilson subsequently testified that defendant did not have a job.

After obtaining a warrant, the police executed a search at defendant's apartment shortly after midnight on Friday, September 20. In the living room, the police observed what appeared to be drops of blood underneath a sofa on the carpet. By the time the police completed their search, Graham's body had been found outside the residence. The case was turned over to the Southfield Police.

Before Graham's body was found, defendant's father had taken defendant to the Wixom police station on September 19, at approximately 6:00 p.m., where defendant was interviewed by Wixom Detective Michael Desrosiers. During this initial interview, which lasted approximately one hour and 20 minutes, defendant was not in custody. Defendant denied knowing Graham's whereabouts. Defendant stated that Graham and two girls came to his apartment to watch a boxing match. Graham and the girls drank and smoked marijuana, but defendant did not. At one point, the alcohol caused Graham to vomit, but Graham cleaned it up. Graham lied down on a couch and, after the boxing match concluded, the two girls left. The next morning, Graham drove defendant to his parents' Detroit house and dropped him off. Defendant went to church that morning and did not see Graham again until Tuesday. On Tuesday, Graham came to the apartment, the two played video games, and ultimately Graham asked defendant if he had a shotgun because he needed to take care of a few things. Defendant responded that the one in the apartment was broken. Graham left, leaving his car keys behind. Defendant claimed that Tuesday was the last time he saw or talked to Graham.

Subsequently, defendant voluntarily went to the Oakland County Sheriff's Office, where he was interviewed by Deputy Christopher Lanfear at approximately midnight; defendant was not in custody at the time. Initially, defendant's statement was consistent with what he told Detective Desrosiers, but the deputy advised defendant that he did not quite believe his story. Defendant then stated that, on Tuesday, he heard a gunshot as Graham and another man, whom he did not know, were leaving the apartment. When he looked out the window, he observed the unknown man drag Graham's body, put it in a car, and drive away. In response, Deputy Lanfear told defendant that the story did not make sense, that he should tell the truth, and that, if he did something in self-defense, he should explain his position. Defendant then stated that there was a struggle between him and Graham in the living room, and he shot Graham one time in the head, at close range, with a .357 pistol. Defendant ultimately wrapped Graham's body in bedding and put it outside in some bushes. Following the interview with Deputy Lanfear, defendant remained at the Sheriff's Department until the Southfield Police arrived.

Southfield Police Detectives William Smarsty and Wojaciechowski interviewed defendant on September 20, at approximately 3:30 a.m. By the time of the interview, Graham's body had been found in the woods and blood had been found in defendant's apartment. Detective Smarsty testified that he read defendant his constitutional rights, and defendant stated that he understood, waived his rights, and agreed to speak with the detectives. Defendant was in custody at this time. Defendant again stated that Graham went to his house to watch a pay-per-view fight on television and there were a couple of girls there also. Graham drank and smoked marijuana, and eventually threw up in the kitchen from drinking too many shots. After the girls

left, Graham repeatedly messed with him, and defendant told Graham to turn down the radio because he wanted to sleep to prepare for church. Defendant and Graham engaged in a pushing match, fell onto the couch, and were face-to-face as Graham held him around the neck; defendant could not breathe. After the detectives told defendant that the scenario was impossible and demonstrated that Graham's arms would have had to have been across the back of defendant's neck, not around the front of it, defendant stated, "That's how it was."

Defendant further stated that he was lying on top of Graham, face-to-face, and, with his left arm, he reached underneath the couch's arm rest to retrieve his gun and fired one shot to the back of Graham's head; the gun was very close to Graham's head. Afterward, defendant picked up Graham's feet and put them on the couch. Because he was scared, defendant took Graham's car keys and cell phone and left the apartment. Defendant stated that, after unloading the gun, he took it to his parents' house on Burgess[1]; he also stated that there was a box of ammunition under a bed. Defendant explained how he cleaned up the couch with household cleaners. On Sunday night, defendant wrapped Graham's body in bedding and dragged him into the woods. Defendant admitted that he put a sticker on Graham's car to try to disguise it. Later, defendant claimed that he put the sticker on the car before watching the fight to play a joke on Graham.

Detective Smarsty testified that he went to the Burgess house and recovered the gun and a box of ammunition under the bed. Michigan State Police Sergeant Shawn Kolonic, who testified at trial as an expert in the area of firearms and tool marks, examined the recovered .357 Magnum Ruger revolver, as well as the fired bullet jacket fragment, fired bullet core, and metallic fragment removed from Graham's skull. He determined that the bullet jacket fragment came from the .357 revolver.

Cheryl Loewe, the Oakland County Deputy Medical Examiner, performed the autopsy on September 20, and was qualified at trial as an expert in forensic pathology. Lowe explained that Graham had one gunshot entrance wound on the back of his head, and there was no evidence of close range firing. After being shot, Graham would have died within seconds. Graham had no bruises or injuries on his body, was wrapped in bedding, and was not wearing shoes.[2]

Detective Smarsty testified that at approximately 5:30 p.m., he spoke with defendant again after learning from the medical examiner that the gunshot had to have been fired from at least two feet away, as opposed to close range. Defendant had been in the holding cell at the Southfield Jail, with access to a bed, bathroom, food, and water. Detective Smarsty testified that during the follow-up interview, defendant initially stayed with his last version until the detectives explained the medical examiner's findings, i.e., that the gunshot could not have been taken at close range because there was no stippling or gun residue on Graham's skull. Defendant then stated that Graham had choked him face-to-face for close to 10 seconds before they both went

---

[1] Detective Smarsty noted that defendant stated that he had discarded the cartridge case, but it was later found in a closet in the apartment.

[2] Lowe testified that there was no alcohol in Graham's system at the time of his death, but there was marijuana.

and sat on the couch. Graham tripped him again, and they messed around some more before Graham sat on the couch and defendant sat on the love seat—a separate couch. Defendant then got up, grabbed the gun underneath the armrest of the couch, took a few steps back, pointed the gun at Graham's head, and took one shot. Defendant stated that Graham did not see him take the gun out. Defendant claimed that Graham had pushed him, tripped him, and choked him. Defendant stated that he did not have any injuries, specifically no bleeding or bruising. While initially stating that "Graham "shouldn't have choked [him]," defendant eventually acknowledged that he had gone too far.

Detective Smarsty explained that given the lack of injuries to defendant, they had a specialist take photographs of defendant's body to show that there were no injuries and trauma evidence from an altercation or incident. The detective also testified that based on the booking information, defendant is six-feet tall and weighed 150 pounds. Based on the medical examiner report, Graham was 6'2" and weighed 136 pounds. During the interview, defendant described himself as "little," noting that Graham was more muscular than him. Defendant told Detective Smarsty that he made some calls on Graham's phone, but never texted on it. However, Graham's father and friend had received text messages from Graham's phone on Sunday and Monday. On Monday, September 16, defendant sold Graham's phone to a Metro PCS on Eight Mile Road in Detroit and received $200. Graham's phone was never recovered.

Defendant was charged with open murder, felony-firearm, and UDAA. Before trial, defendant filed a motion to suppress his statements. He argued that his statements were the product of confusion and duress, and were not given voluntarily. An evidentiary hearing was held pursuant to *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965). Defendant did not testify at the hearing. The interrogating officers, Deputy Lanfear and Detective Smarsty, were the only witnesses, and the videotaped recordings of defendant's interviews were admitted. The parties stipulated that defendant appeared voluntarily at the Wixom Police Department with his father on September 19, 2013, and defendant's father was present at the building when defendant took a polygraph examination. The parties also stipulated that, after defendant agreed to take the polygraph, Detective Desrosiers drove defendant to the polygraph location, the Oakland County Sheriff's Department; defendant was seated in the front seat and Detective Allen was seated in the back.

Deputy Lanfear, a polygraph examiner, testified that he conducted a polygraph examination with defendant on September 20, at approximately 12:26 a.m., about a missing person. The entire process, including hooking defendant up to the machine, usually takes 2½ hours. Defendant was not in custody and had agreed to take the polygraph examination. When defendant first came in, the deputy asked defendant if he needed to use the bathroom or if he needed any food or water, and defendant replied that he did not. Deputy Lanfear advised defendant of his rights using a standard advice of rights form, which defendant signed. He read the form to defendant word by word, asked defendant three questions, and defendant answered all three questions affirmatively. Deputy Lanfear questioned defendant about the missing person, and defendant knew the specific questions that he would be asked before the test. Consistent with his training, the deputy repeated the questions three times, which took 45 minutes. At 2:00 a.m., the deputy advised defendant that he did not pass the polygraph, and the brief post-test interview began, wherein defendant had the opportunity to explain why he thought he failed.

-4-

Deputy Lanfear explained that at the conclusion of the polygraph, he had told defendant that he did not believe his story and then defendant gave a different story. The entire process in defendant's case took less than two hours, and they were done before 2:30 a.m. Wixom Detectives Allen and Desrosiers observed Deputy Lanfear's interview of defendant on a closed circuit television, but no Southfield Police officers were present.

Detective Smarsty testified that he and Detective Wojaciechowski went to the Oakland County Sheriff's Department to interview defendant about his involvement in a homicide. They were called in after it was revealed that the shooting occurred in Southfield. They interviewed defendant at 3:24 a.m. on September 20, and the interview lasted until 5:30 a.m. When Detective Smarsty arrived, he already knew that defendant had agreed to take a polygraph examination and had made some admissions about his involvement in Graham's death. He also was aware that the search of defendant's apartment had been completed, and that Graham's body had been found with single gunshot wound to the back of the head. Defendant was in custody at that point, but not yet in handcuffs. The detectives took defendant to an interview room and read defendant his *Miranda* rights; defendant signed the form at 3:24 a.m. The interview was recorded. The detective asked defendant if he was under the influence of drugs or alcohol. Consistent with defendant's denial, the detective also observed that defendant did not appear to be under the influence of anything. Defendant stated that he graduated from high school, could read and write, and was taking criminal justice classes at a community college.

Detective Smarsty asked defendant to give his account of what happened, and defendant explained that he and Graham had struggled before he shot him. The detective did not believe defendant's story because it did not make sense from a physical standpoint. Although the recording is time-stamped, he believed that the entire interview was less than two hours. Following the interview, defendant was placed under arrest and transported to the Southfield Police Department's "holding facility, a jail." While housed in the jail, defendant would have had the opportunity to use the bathroom, drink, and eat, and was provided with a place to sit and lie down. Once they arrived at the jail, the detective transferred defendant to the custody of the patrol officer and had no further contact with him until 5:30 p.m.

Detective Smarsty explained that he later received information from the medical examiner that led him to interview defendant a second time. Specifically, he was informed that the distance of the gunshot did not match defendant's explanation of what happened. Defendant's second interview with the Southfield detectives occurred at 5:26 p.m. in an interview room and was also recorded. Detective Smarsty advised defendant that he was still under his *Miranda* rights read earlier that day, and defendant said he understood and agreed to speak with them. Defendant did not appear to be tired, hungry, or thirsty. Before they began the interview, the detective asked defendant if he wanted something to eat or drink and defendant stated that he was fine. After the detectives explained that his explanation of shooting was inconsistent with the medical examiner's report, defendant altered his account of what happened. The interview lasted approximately one hour, and defendant was escorted back to the jail. Defendant was advised that he could not make any phone calls at that time.

Following the testimony and arguments, the trial court took the case under advisement to review the evidence, and issued its ruling on the first day of trial. After referring to its review of the DVDs of the interviews and the testimony of the witnesses, the trial court stated:

In observing the interviews, this Court did not see that the officers in any way badgered the defendant, they didn't attempt to lead him in any way. The defendant was coherent, he didn't appear to be under the influence of any medication or other drugs. The defendant is a high school graduate and he also indicated that he was taking classes at Henry Ford Community College. The defendant appeared to understand what was being asked of him and what was said to him.

Based upon my observations of both the DVDs and the testimony that's been—that was heard by this Court, it appears to this Court that the defendant did voluntarily waive his rights based upon the totality of the circumstances, and that nothing that I heard or that I saw indicated that his confession was either coerced or that he did not understand what was going on.

Accordingly, the trial court denied defendant's motion to suppress.

The prosecution theorized at trial that Graham's death was premeditated and deliberate, and that defendant killed Graham to steal his Impala. The prosecution requested that the jury be instructed on felony-murder, which the trial court granted. Before deliberations, the parties discussed the jury instructions and, after a brief recess, court reconvened and the following exchange occurred regarding those instructions:

*Defense counsel*: We are ready to proceed, Judge. We've got the jury instructions all together. Mr. Hall showed them to me, I have no objections the way they're assembled, and *everything that is included there I believe is correct*.

*The court*: All right. If you're in agreement that they're all acceptable I'll bring the jury in and charge the jury at this time.

*Defense counsel*: Thank you. [Emphasis added.]

Subsequently, the trial court instructed the jury as follows regarding self-defense:

A person can use deadly force in self-defense only where it is necessary to do so. If the defendant could have safely retreated but did not do so, you may consider that fact in deciding whether the defendant honestly and reasonably believed he needed to use deadly force in self-defense.

However, *a person is never required to retreat if attacked in his own home*, nor if the person reasonably believes that an attacker is about to use a deadly weapon, nor if the person is subject to a sudden, fierce and violent attack. [Emphasis added.]

After the trial court completed its final instructions and before the jury was dismissed for deliberations, it asked the parties whether they "have any issues with the instructions." After speaking with the judge, defense counsel stated that he was "satisfied." The jury convicted defendant of first-degree murder and the trial court sentenced defendant as noted above.

-6-

II

Defendant first contends that the trial court erred in denying his motion to suppress his police statements and allowing the statements to be admitted at trial because his confession and waiver of *Miranda* rights was involuntary. We disagree.

Statements of an accused made during a custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waives his or her Fifth Amendment rights. *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966); *People v Abraham*, 234 Mich App 640, 644; 599 NW2d 736 (1999). Whether an accused's statement was knowing, intelligent, and voluntary is a question of law that a court evaluates under the totality of the circumstances. *Abraham*, 234 Mich App at 644-645. Although the entire record is reviewed de novo, deference is given to the trial court's findings, and the trial court's findings of fact will not be disturbed unless they are clearly erroneous. *Id*. at 644. "The trial court's factual findings are clearly erroneous if, after review of the record, this Court is left with a definite and firm conviction that a mistake has been made." *People v Givans*, 227 Mich App 113, 119; 575 NW2d 84 (1997). "The state has the burden of proving by a preponderance of the evidence that there was a valid waiver of the suspect's rights." *Abraham*, 234 Mich App at 645.

Coercive police activity is a necessary predicate to a finding that a confession is not voluntary. *Colorado v Connelly*, 479 US 157, 164; 107 S Ct 515; 93 L Ed 2d 473 (1986). "The test of voluntariness is whether, considering the totality of all the surrounding circumstances, the confession is the product of an essentially free and unconstrained choice by its maker, or whether the accused's will has been overborne and his capacity for self-determination critically impaired." *Givans*, 227 Mich App at 121.

> In determining whether a statement is voluntary, the trial court should consider, among other things, the following factors: the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*People v Cipriano*, 431 Mich 315, 334; 429 NW2d 781 (1988) (citation omitted).]

No single factor is conclusive. *Id*.; *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998). "Unnecessary delay is one factor to consider in reaching this conclusion, the focus being not just on the length of delay, but rather on what occurred during the delay and its effect on the accused." *Cipriano*, 431 Mich at 334-335.

Defendant argues that his statements were coerced and involuntary because (1) he was interrogated numerous times for several hours, resulting in a total interrogation time of approximately nine hours; (2) he was held "completely cut off from his family and anyone else

for 24 hours"; (3) he was deprived of sleep; (4) he may not have been provided food; (5) the officers repeatedly told defendant they did not believe him, increasing the pressure to confess; and (6) he was young and inexperienced, having never have been convicted of a crime. After reviewing the record, we conclude that the trial court did not err in denying defendant's motion to suppress his statements because the statements were voluntarily made.

As an initial matter, defendant misrepresents the circumstances of the repeated interviews that occurred during his 24-hour "detention." Accompanied by his father, defendant voluntarily went to the Wixom Police Department on September 19, 2013, at approximately 6:00 p.m. He was not in custody and, as the trial court aptly observed, "he was free to leave at any time he chose to do so." After this initial interview, defendant agreed to take a polygraph examination, which necessitated travel to the Oakland County Sheriff's Department. The polygraph examination interview—the second interview—occurred at 12:26 a.m.; the preparation and actual questioning lasted less than two hours. Defendant was advised of his *Miranda* rights before he was questioned, indicated that he understood those rights, and signed a written waiver. The evidence established that defendant declined the interviewing deputy's offers of water and food, and to use the bathroom. After defendant failed the polygraph examination and it was disclosed that Graham was shot in Southfield, Southfield police detectives were summoned to further interview him. Southfield police detectives arrived and began interviewing defendant at approximately 3:20 a.m. He was again advised of his *Miranda* rights, indicated that he understood those rights, and signed a written waiver. The interview lasted approximately two hours, upon which defendant was transported to the Southfield jail, where a bed, water, food, and bathrooms were available. The Southfield detectives had no further contact with defendant until they interviewed him at 5:30 p.m. after receiving new information; this final interview lasted less than one hour. The evidence indicated that, before beginning this last interview, defendant declined the detectives' offer of sustenance.

Given this record, the totality of the circumstances indicate that defendant was not coerced through prolonged questioning or detention, but that defendant attempted to falsely deny involvement in the crime, and voluntarily submitted to a polygraph examination as a means of lending credibility to his exculpations. When confronted with suggestions that his performance was unconvincing and with newly discovered evidence, he altered his account, ultimately opting to confess his involvement, despite full knowledge of his constitutional rights. There is no evidence that defendant was threatened, abused, or promised anything in exchange for his statements. Nor is there evidence that the police deliberately isolated defendant from his family for the purpose of coercing a confession or that defendant ever requested the opportunity to speak with his family. Even if he had, the police would not have been required to grant such a request for an adult suspect facing a murder charge. There is likewise no evidence that defendant was ill, intoxicated, under the influence of drugs, or deprived of food or drink. Although defendant claims that he was sleep deprived, defendant never complained or indicated to the police that he was tired, and the video recording and the detective's testimony demonstrates that defendant was consistently alert, attentive, and focused on the questions asked of him. While defendant suggests that his youth should be considered, nothing elicited during the hearing established that defendant's age or circumstances impaired his ability to make a voluntary statement. He was 21 years old, could read and write, was taking criminal justice classes in community college, and there is no indication that he had any learning disability or psychological problems.

Viewing the totality of the circumstances, we are not convinced that a mistake was made in denying defendant's motion to suppress his statements. Defendant did not testify about the circumstances of his statements. Thus, the trial court rendered its decision from the video recordings of defendant's interviews and the testimony of the officers who conducted the interviews, which the trial court apparently found to be credible. Because the evidence was sufficient to support the trial court's finding, and giving deference to the trial court's assessment of the evidence and the officers' credibility, there is no basis to disturb the trial court's findings.

III

Defendant next argues that his conviction for first-degree murder must be vacated because the prosecution failed to present sufficient evidence of either alternative theory of premeditation and felony murder. We disagree.

When ascertaining whether sufficient evidence was presented at trial to support a conviction, we must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

A

First-degree premeditated murder requires proof that the defendant "intentionally killed the victim and that the act of killing was premeditated and deliberate." *People v Ortiz*, 249 Mich App 297, 301; 642 NW2d 417 (2002). Defendant contends that there was insufficient evidence to establish the requisite elements of premeditation and deliberation. "Premeditation and deliberation require sufficient time to allow the defendant to take a second look. The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing." *People v Anderson*, 209 Mich App 527, 537; 531 NW2d 780 (1995) (citation omitted). The following nonexclusive list of factors may be considered to establish premeditation: "(1) the previous relationship between the defendant and the victim; (2) the defendant's actions before and after the crime; and (3) the circumstances of the killing itself, including the weapon used and the location of the wounds inflicted." *People v Plummer*, 229 Mich App 293, 300; 581 NW2d 753 (1998). "[M]inimal circumstantial evidence will suffice to establish the defendant's state of mind[.]" *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008).

The prosecution presented evidence of defendant's statement to the police in which he claimed that he shot Graham in self-defense. Defendant stated that Graham choked him for nearly 10 seconds, that he and Graham separated and sat on the couch, that Graham attempted to mess with him again, they separated, and Graham sat on the couch and defendant sat on the love seat—a different sofa from Graham. Defendant stated that he then got up, grabbed a gun from underneath the arm rest of the couch, took a few steps back, aimed the gun at Graham's head, and fired. Even accepting this version of events, the evidence, viewed in a light most favorable to the prosecution, was sufficient for a jury to find premeditation and deliberation beyond reasonable doubt because defendant acted after the physical altercation had ended and Graham

-9-

was sitting on a separate couch. The jury reasonably could have found that defendant was in no imminent danger, and the time required between defendant's conduct of retrieving the weapon, stepping back, and aiming the gun at Graham's head afforded him sufficient time "to take a second look." *Anderson*, 209 Mich App at 537. Further, evidence that, after the crime, defendant attempted to conceal Graham's death, hid his body, gave the police multiple different versions of what occurred, modified the accounts as he was confronted with new evidence, and ultimately admitted his involvement only after being presented with incriminating evidence, further supports a finding of premeditation and deliberation. See *Plummer*, 229 Mich App at 300.

Additionally, use of a deadly weapon establishes premeditation "where circumstances show a motive or plan that would enable the trier of fact to infer that the killing was not a spur-of-the-moment decision." *Plummer*, 229 Mich App at 304 n 1. The prosecution presented evidence that defendant did not own a car and was unemployed, whereas Graham owned a white Chevrolet Impala. Defendant's girlfriend and the mother of his child testified that, sometime before Graham's death, defendant told her that he was getting a white Impala, supposedly from the person for whom he was house-sitting. There was evidence that, after defendant shot Graham, he attempted to disguise Graham's Impala by covering or replacing an identifiable sticker in the back window and placed his family's personal items inside the car. While continuing to conceal Graham's death, defendant drove Graham's Impala around, told his girlfriend that the Impala was his, gave her a spare key, and discussed changing the color of the car. From this evidence, a jury could reasonably conclude that defendant's decision to kill Graham was not a spur-of-the-moment act, but rather was motivated by his intent to steal Graham's Impala.

In sum, the reasonable inferences arising from the evidence, considered together, were sufficient to support a finding of premeditation and deliberation for first-degree murder beyond a reasonable doubt. Although defendant argues that different inferences should be drawn from the evidence, "[i]t is the jury's duty to determine the weight to be accorded any inferences[,]" and "[w]e do not interfere with the jury's assessment of the weight and credibility of witnesses or the evidence[.]" *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013). Rather, this Court must "draw all reasonable inferences and make credibility choices in support of the jury verdict[,]" and "[t]he scope of review is the same whether the evidence is direct or circumstantial." *Nowack*, 462 Mich at 400. The evidence was sufficient to sustain defendant's conviction of first-degree premeditated murder.

B

Regarding defendant's felony-murder conviction, defendant argues that his conviction cannot stand because the prosecution failed to present sufficient evidence that Graham was killed while committing, or attempting to commit, a larceny.

> The elements of felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b).

[*People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009) (citation omitted).]

The felony-murder charge in this case was based on the alleged predicate felony of larceny, which is specifically enumerated in MCL 750.316(1)(b). The elements of larceny are:

> (1) an actual or constructive taking of goods or property, (2) a carrying away or asportation, (3) the carrying away must be with a felonious intent, (4) the subject matter must be the goods or personal property of another, (5) the taking must be without the consent and against the will of the owner. [*People v Cain*, 238 Mich App 95, 120; 605 NW2d 28 (1999) (citation omitted).]

"[T]he specific intent necessary to commit larceny is the intent to steal another person's property." *Id*. The felony-murder doctrine does not apply if the intent to steal the victim's property was not formed until after the homicide. *People v Brannon*, 194 Mich App 121, 125; 486 NW2d 83 (1992). However, "a murder committed during the unbroken chain of events surrounding the predicate felony is committed 'in the perpetration of' that felony[.]' " *People v Gillis*, 474 Mich 105, 121; 712 NW2d 419 (2006). The murder and the felony need not be contemporaneous; rather, the defendant need only have intended to commit the underlying felony when the homicide occurred. *Brannon*, 194 Mich App at 125.

Evidence that defendant told his girlfriend that he was getting a white Impala before he killed Graham, and that, after he killed Graham, he identified the Impala as his own, attempted to disguise it, drove it regularly, moved his family's personal items into the car, gave his girlfriend a spare car key, and discussed his plan to change the Impala's color, viewed in a light most favorable to the prosecution, was sufficient for a rational trier of fact to find beyond a reasonable doubt that defendant formulated the intent to steal Graham's car before he killed Graham. Consequently, there was sufficient evidence to sustain defendant's conviction for felony murder.

IV

Finally, defendant argues that he was denied due process because the trial court erroneously instructed the jury regarding the general duty to retreat in its self-defense instruction, even though defendant had no duty to retreat because he was in his home. He contends that, although the erroneous instruction was followed by the instructions regarding the circumstances in which there is no duty to retreat, the erroneous instruction only served to confuse the jury. We disagree.

Before deliberations, the parties discussed the jury instructions and, after a brief recess, court reconvened and defense counsel indicated that he had no objections to the jury instructions and the instructions were correct. After the trial court instructed the jury regarding self-defense, defense counsel expressed his satisfaction with the instructions. By expressly and repeatedly approving the jury instructions, defendant waived any objection. *People v Kowalski*, 489 Mich 488, 504; 803 NW2d 200 (2011). Defendant's waiver extinguished any error, leaving no error to review. *People v Carter*, 462 Mich 206, 216; 612 NW2d 144 (2000).

Defendant alternatively argues that defense counsel was ineffective for failing to object to the instructions as given. Again, we disagree.

-11-

Because defendant failed to raise an ineffective assistance of counsel claim in the trial court, our review of that claim is limited to mistakes apparent from the record. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). Effective assistance of counsel is presumed and defendant bears a heavy burden of proving otherwise. *People v Effinger*, 212 Mich App 67, 69; 536 NW2d 809 (1995).

> To prove that defense counsel was not effective, the defendant must show that (1) defense counsel's performance was so deficient that it fell below an objective standard of reasonableness and (2) there is a reasonable probability that defense counsel's deficient performance prejudiced the defendant. The defendant was prejudiced if, but for defense counsel's errors, the result of the proceeding would have been different. [*Heft*, 299 Mich App at 80-81 (citations omitted).]

"A court must instruct the jury so that it may correctly and intelligently decide the case." *People v Crawford*, 232 Mich App 608, 620; 591 NW2d 669 (1998). Jury instructions are reviewed in their entirety to determine whether any error requiring reversal occurred. *Kowalski*, 489 Mich at 501. "Accordingly, an imperfect instruction is not grounds for setting aside a conviction of the instruction fairly presented the issues to be tried and sufficiently protected the defendant's rights." *Id.* at 501-502. In *People v Richardson*, 490 Mich 115, 117-119; 803 NW2d 302 (2011), our Supreme Court considered essentially the same instruction given in this case under similar facts in which the defendant had no duty to retreat. The *Richardson* Court concluded that the defendant failed to establish that the given instruction constituted plain error:

> The instruction correctly told the jurors that, if defendant was in his home, he did not have to retreat. It also correctly informed them that defendant was entitled to use deadly force in self-defense only if it was necessary to do so.
>
> It is apparent that the jury concluded that deadly force was not necessary and that the facts support that conclusion. An instruction that omitted the general duty to retreat and informed the jury only that defendant had no duty to retreat might have been clearer. However, defense counsel did not ask the court to give such an instruction. And defendant was not prejudiced by this omission because the jury was, in fact, informed that a person attacked in his or her home has no duty to retreat. [*Id.* at 119-120.]

In this case, as in *Richardson*, defendant cannot show that he was prejudiced by the trial court's initial reference to the general duty to retreat because its effect, if any, was nullified by the trial court's immediate subsequent and specific instruction that "a person is *never* required to retreat if attacked in his own home." (Emphasis added.) The trial court's instruction, viewed in its entirety, fairly presented the defense of self-defense and sufficiently protected defendant's rights. *Kowalski*, 489 Mich at 501-502.[3] Consequently, defendant cannot succeed on his

---

[3] Defendant cites *People v Riddle*, 467 Mich 116, 141 n 30; 649 NW2d 30 (2002), in which our Supreme Court stated:

ineffective assistance of counsel claim. Because the jury was, in fact, informed that a person attacked in his own home has no duty to retreat, it was not objectively unreasonable for counsel not to object to the instructions. Further, defendant cannot show any prejudice arising out of defense counsel's failure to object. *Heft*, 299 Mich App at 81. As in *Richardson*, "the success of defendant's self-defense claim did not hinge on whether he was required to retreat or stand his ground on his porch. Rather, it hinged on whether he honestly and reasonably believed that it was necessary to use deadly force while standing his ground." *Richardson*, 490 Mich at 122. Accordingly, defendant's alternative claim of ineffective assistance must fail.

Affirmed.

/s/ Michael J. Talbot
/s/ Kurtis T. Wilder
/s/ Karen M. Fort Hood

---

There might be circumstances in which an instruction permitting the jury to consider a defendant's failure to retreat would be improper; for instance, if the defendant was inside his dwelling when he was attacked or if the undisputed evidence established that he was suddenly and violently attacked. In such a case there would be no basis for an instruction allowing the defendant's failure to retreat to be considered in determining whether he acted in lawful self-defense. In the instant case, the parties disputed whether defendant had any reason whatsoever to believe that he was in danger. Thus, it was properly within the province of the jury to determine whether defendant honestly and reasonably believed that it was necessary to exercise deadly force. [Citation omitted.]

However, as the *Richardson* Court noted, the defendant in *Riddle* was not in his home when attacked, so this passage was obiter dictum. *Richardson*, 490 Mich at 122 n 12.

-13-